UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ZHENJUN HU, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| INSULET CORPORATION, ASHLEY A. MCEVOY, JAMES R. HOLLINGSHEAD, FLAVIA H. PEASE, ANA M. CHADWICK, ERIC BENJAMIN, and TRANG LY, | |
| Defendants. | |

Plaintiff Zhenjun Hu ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Insulet Corporation ("Insulet" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Insulet securities between

1

February 21, 2025 and May 26, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Insulet develops, manufactures, and sells insulin delivery systems for people with insulin-dependent diabetes in the U.S. and internationally.

3.      The Company offers, *inter alia*, its "Omnipod 5" automated insulin delivery ("AID") system, which includes a proprietary AID algorithm embedded in the pod that integrates with a third-party continuous glucose monitor to obtain glucose values through wireless Bluetooth communication; and its "Omnipod Dash", which features a Bluetooth enabled Pod that is controlled by a smartphone-like Personal Diabetes Manager.

4.      Insulet also formerly offered the Omnipod Insulin Management System, its predecessor to the Omnipod 5, prior to the Class Period, but had already begun to phase out the product by the start of the Class Period.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Insulet's manufacturing controls and procedures were defective; (ii) the foregoing created a foreseeable heightened risk that one or more Insulet products would be found to be in violation of applicable safety regulations and/or pose a risk of injury; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6.      The truth began to emerge on March 12, 2026, when Insulet disclosed that it had "initiated a voluntary Medical Device Correction for specific lots of Omnipod® 5 Pods after

identifying a manufacturing issue through its ongoing product monitoring" (the "March 2026 MDC").

7.    On this news, Insulet's stock price fell $16.23 per share, or 6.88%, to close at $219.84 per share on March 13, 2026.

8.    Then, on May 26, 2026, Insulet disclosed the "initat[ion]" of another "voluntary Medical Device Correction" (the "May 2026 MDC"), this time "for specific lots of Omnipod® 5, Omnipod Dash®, and Omnipod® Insulin Management System (Omnipod Eros) Pods due to a manufacturing issue, identified through ongoing product monitoring, that could result in insulin under-delivery."

9.    On this news, Insulet's stock price fell $7.79 per share, or 5.07%, to close at $146.01 per share on May 27, 2026.

10.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Insulet is headquartered in this District, Defendants

conduct business in this District, and a significant portion of Defendants' actions took place within this District.

14.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

15.    Plaintiff, as set forth in the attached Certification, acquired Insulet securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.    Defendant Insulet is a Delaware corporation with principal executive offices located at 100 Nagog Park, Acton, Massachusetts 01720.  The Company's common stock trades in an efficient market on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "PODD".

17.    Defendant Ashley A. McEvoy ("McEvoy") has served as Insulet's President, Chief Executive Officer ("CEO"), and a member of its Board of Directors (the "Board") since April 28, 2025.

18.    Defendant James R. Hollingshead ("Hollingshead") served as Insulet's President, CEO, and a member of its Board from before the start of the Class Period to April 28, 2025.

19.    Defendant Flavia H. Pease ("Pease") has served as Insulet's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") since September 30, 2025.

20.    Defendant Ana M. Chadwick ("Chadwick") served as Insulet's EVP and CFO from before the start of the Class Period to September 30, 2025.

4

21.     Defendant Eric Benjamin ("Benjamin") served as Insulet's EVP and Chief Operating Officer from August 25, 2025 to the end of the Class Period.  From the start of the Class Period to August 25, 2025, Defendant Benjamin served as Insulet's Chief Product and Customer Experience Officer.

22.     Defendant Trang Ly ("Ly") served as Insulet's Senior Vice President and Chief Medical Officer at all relevant times.

23.     Defendants McEvoy, Hollingshead, Pease, Chadwick, Benjamin, and Ly are collectively referred to herein as the "Individual Defendants."

24.     The Individual Defendants possessed the power and authority to control the contents of Insulet's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Insulet's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Insulet, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

25.     Insulet and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26.     Insulet develops, manufactures, and sells insulin delivery systems for people with insulin-dependent diabetes in the U.S. and internationally.

27.     The Company offers, *inter alia*, its "Omnipod 5" AID system, which includes a proprietary AID algorithm embedded in the pod that integrates with a third-party continuous glucose monitor to obtain glucose values through wireless Bluetooth communication; and its "Omnipod Dash", which features a Bluetooth enabled Pod that is controlled by a smartphone-like Personal Diabetes Manager.

28.     Insulet also formerly offered the Omnipod Insulin Management System, its predecessor to the Omnipod 5, prior to the Class Period, but had already begun to phase out the product by the start of the Class Period.

### Materially False and Misleading Statements Issued During the Class Period

29.     The Class Period begins on February 21, 2025, the first trading day after Insulet issued a press release during post-market hours announcing its financial and operating results for the quarter and year ended December 31, 2024, and held a conference call to discuss the same. During that call, Defendant Hollingshead assured investors that Defendants had put "years" into "build[ing]" the Omnipod 5 "at scale with quality . . . [and] safety", stating *inter alia*:

> As we advance through 2025, we will remain relentlessly focused on driving the diabetes industry forward with Omnipod 5. . . .  Our form factor is unique and has proven very difficult to replicate. ***It took us years to build a patch pump product at scale with*** quality, high yield, ***safety*** and very well protected IP.[1]

---

[1] All emphases herein have been added unless otherwise indicated.

30. On February 21, 2025, Insulet filed an annual report on Form 10-K with the SEC, announcing its financial and operating results for the quarter and year ended December 31, 2024 (the "FY 2024 10-K"). That filing stated, in relevant part:

> In order to manufacture sufficient volumes of our Pods at high quality while still achieving a cost-effective per unit production price, we have designed our Pods to be manufactured through automation. We produce our products at our highly automated manufacturing facility in Acton, Massachusetts and, beginning in June 2024, also at our new highly automated manufacturing plant in Malaysia, which we constructed to support our international expansion strategy and further ensure product supply.
>
> We also produce our devices on manufacturing lines at a facility in China operated by a contract manufacturer. This contract manufacturing agreement expires in October 2025 and is subject to automatic renewal, unless canceled by either party under the terms of the contract.
>
> We also continue to invest in supply chain efficiencies, including automation improvements at our suppliers and contract manufacturer.

31. The FY 2024 10-K included further assurances as to Defendants' "[q]uality [a]ssurance" efforts, specifically referencing the Company's Quality team's work "audit[ing]" third-party vendors who manufacture certain components in Insulet products, and "inspect[ing] and test[ing]" Insulet products "at various steps in the manufacturing cycle", stating *inter alia*:

> We utilize outside vendors for the supply of components, sub-assemblies, and various services used in the manufacture of our products. Our outside vendors produce the components to our specifications, and they are audited periodically by our Quality team to confirm conformity with the specifications, policies, and procedures for our products. Our Quality team also inspects and tests our products at various steps in the manufacturing cycle to facilitate compliance with our specifications.

32. On May 8, 2025, Insulet issued a press release announcing the Company's financial and operating results for the quarter ended March 31, 2025, and held a conference call to discuss the same. During this call, Defendant Chadwick boasted of the "significant investments" that

Defendants had "made and will continue to make . . . in manufacturing and advanced automating",

stating *inter alia*:

> Our global launches are gaining momentum, and the advantage we hold with Omni 5 is undeniable. ***We've also made and will continue to make significant investments in manufacturing and advanced automation***, providing us with economies of scale and most importantly, expanding access for more patients around the world.

33.    On May 9, 2025, Insulet filed a quarterly report on Form 10-Q with the SEC,

reporting the Company's financial and operating results for the quarter ended March 31, 2025.

That filing stated, in relevant part, that "[w]e anticipate gross margin to increase compared with

2024 primarily due to improved manufacturing efficiencies and volume and pricing benefits[.]"

34.    On August 7, 2025, Insulet filed a quarterly report on Form 10-Q with the SEC,

reporting the Company's financial and operating results for the quarter ended June 30, 2025.  That

filing, too, stated that "[w]e anticipate gross margin to increase compared with 2024 primarily due

to improved manufacturing efficiencies, pricing benefits and volume[.]"

35.    Also on August 7, 2025, Insulet held a conference call (the "Q2 2025 Earnings

Call") to discuss the financial and operating results reported in the Form 10-Q it filed that day.

During that call, Defendant McEvoy assured investors that Defendants' "advanced automation in

our plants" and "robust and secure" global supply chain enabled them to "deliver" their products

"at medical standards", stating *inter alia*:

> Orchestrating a superior end-to-end experience for Podders has required us to divide and invest in thoughtful solutions across our business.  Over the past decade, we've invested more than $1 billion in manufacturing capabilities.  ***We have pioneered advanced automation in our plants and built a robust and secure global supply chain to deliver tens of millions of complex electromechanical devices per year at medical standards***.

36.    Later during the Q2 2025 Earnings Call, when asked about the positive rate of

multiple-daily injection ("MDI") and competitive conversions that Defendant Chadwick had

discussed earlier in the call, Defendant Benjamin explicitly tied this good news to his claim that the Omnipod 5 "*is safe*", stating *inter alia*:

> MDI accelerated and competitive conversions accelerated, and both type 1 and type 2 grew year-over-year and sequentially. ***In terms of what's driving that, we think it's a couple of things. First, we've delivered impactful innovation. Omnipod 5 is safe, effective, understood to be really easy to use***. And we've done a great job making it acceptable. So that pay-as-you-go access with no commitment at low co-pay, makes it easy for folks to get started with that great technology.

37. On September 4, 2025, Defendants McEvoy and Chadwick presented on behalf of Insulet at the Wells Fargo 20th Annual Healthcare Conference 2025, during which Defendant McEvoy touted the safety of Omnipods. First, in response to a question concerning why Insulet's customers with type 2 diabetes use more Omnipods than its customers with type 1 diabetes, Defendant McEvoy stated: "one, the science has been proven that it's efficacious and safer [sic] technology; two, the access and affordability is there."

38. Later during the Wells Fargo Presentation, when discussing how Insulet could sustain its position relative to its competitors, Defendant McEvoy stated that Insulet's "competitive moats" included "clinical evidence around showing . . . safety", stating *inter alia*:

> ***Insulet has really created a lot of durable moats, I'd say, competitive moats***. One is while this looks simple, it's actually very complicated, and it's taken us years to perfect and we're continuing to perfect because we're constantly updating what's inside and all the software related to that. We've invested — it's also hard to make these tens of millions of these at scale at a 70% GP. And then third, ***it's around clinical evidence around showing*** performance and both efficacy as well as ***safety***.

39. On November 6, 2025, Insulet filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2025. That filing, too, stated that "[w]e anticipate gross margin to increase compared with 2024 primarily due to improved manufacturing efficiencies, pricing benefits and volume[.]"

9

40.     Also on November 6, 2025, Insulet issued a press release announcing the financial and operating results reported in the Form 10-Q it filed that day, and held a conference call to discuss the same.  During that call, Defendant McEvoy assured investors that the Company's Acton, Massachusetts manufacturing facility was "delivering strong customer service", stating *inter alia*:

> ***Our manufacturing facilities in Acton and Malaysia are ramping ahead of plan, delivering strong customer service*** and improved margins.  We're accelerating investments to further increase capacity at these facilities to support our strong growth trajectory.

41.     On February 18, 2026, Insulet filed an annual report on Form 10-K with the SEC, announcing its financial and operating results for the quarter and year ended December 31, 2024 (the "FY 2025 10-K").  Like the FY 2024 10-K, this annual report included assurances as to Defendants' "[q]uality [a]ssurance" efforts, specifically referencing the Company's Quality team's work "audit[ing]" third-party vendors who manufacture certain components in Insulet products, and "inspect[ing] and test[ing]" Insulet products "at various steps in the manufacturing cycle", stating *inter alia*:

> We utilize outside vendors for the supply of components, sub-assemblies, raw materials, and various services used in the manufacture of our products. Our outside vendors produce the components to our specifications, and they are audited periodically by our Quality team to confirm conformity with the specifications, policies, and procedures for our products. Our Quality team also inspects and tests our products at various steps in the manufacturing cycle to facilitate compliance with our specifications.

42.     Also on February 18, 2026, Insulet held a conference call to discuss the financial and operating results reported in its FY 2025 Form 10-K (the "FY 2025 Earnings Call").  During that call, Defendant McEvoy stated that the Omnipod had "strong proven clinical performance", as to "both efficacy and safety", stating *inter alia*:

10

I think the biggest unmet need for us is to really start to improve the acumen among the clinical base, particularly in the U.S. of our strong clinical performance.  So in addition to being #1 prescribed and #1 most requested predominantly because of our differentiated form factor and user experience, *we also want them to know and be well aware of just the strong proven clinical performance, both efficacy and safety and unsurpassed in the category*.  I think that will be new information for many more clinicians.

43.    Later during the FY 2025 Earnings Call, in response to a question asking for her thoughts as to "the most underappreciated part of the Insulet story", Defendant McEvoy named Defendants' "ability to manufacture at scale" and claimed "*we produce tens of millions of Pods with high-quality medical-grade quality at consumer electronic scale*", stating *inter alia*:

*I would highlight 4 key areas*.  Number one is our tech lead, which we'll continue to innovate off of.  I'll come back to that. I would say number two, is our growing commercial prowess.  I'll come back to that.  *Three is our manufacturing at scale*; and four is our financial strength. . . .  as Flavia was mentioning in her opening remarks, 30,000 prescribers with Omnipod, which is up 28%.  Very strong brand loyalty, and we continue to have unparalleled access and affordability.  *We manufacture at scale.  It's one thing to get regulatory approval, it's different than to manufacture.  We produce tens of millions of Pods with high-quality medical-grade quality at consumer electronic scale.  And when we say something, we execute on what we're going to say*.  I'm really pleased the team is building out Malaysia.  We're already margin accretive in Malaysia.  In Acton, we've improved productivity, and we've already started to break ground on Costa Rica.

44.    The statements referenced in ¶¶ 29–43 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) Insulet's manufacturing controls and procedures were defective; (ii) the foregoing created a foreseeable heightened risk that one or more Insulet products would be found to be in violation of applicable safety regulations and/or pose a risk of injury; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

45.     The truth began to emerge on March 12, 2026, when Insulet disclosed that it had "initiated a voluntary Medical Device Correction for specific lots of Omnipod® 5 Pods after identifying a manufacturing issue through its ongoing product monitoring."   Insulet further disclosed that this MDC applied to "specific identified lots distributed in the United States," and that this MDC was necessary because the affected Pods "may have a small tear in the internal tubing that delivers insulin" and "[i]f this occurs, insulin may lead inside the Pod instead of being fully infused into the body as intended."

46.     On this news, Insulet's stock price fell $16.23 per share, or 6.88%, to close at $219.84 per share on March 13, 2026.

47.     Notwithstanding the foregoing disclosures and resulting drop in Insulet's share price, Insulet's stock continued to trade at artificially inflated prices due to Defendants' continued false and misleading statements about the scope and severity of the manufacturing issue that precipitated the March 2026 MDC, and the degree to which Defendants' remedial actions would avert the need for further MDCs of Pod products due to tears in the Pods' internal tubing that delivers insulin.

48.     For example, in the same announcement in which Insulet disclosed its March 2026 MDC, Insulet further stated that "***all other Omnipod® 5 Pods and Omnipod® products remain safe to use***."

49.     Insulet also stated that it "identified that certain Pods from ***specific lots*** may have a small tear in the internal tubing that delivers insulin", suggesting that this specific issue was localized to only "specific lots" that were subject to the March 2026 MDC.

50.     In addition, on March 13, 2026, Defendant Ly appeared on behalf of Insulet at the Advanced Technologies & Treatments for Diabetes Conference, and discussed the March 2026 MDC.  Defendant Ly represented that the scope of the safety issue Defendants uncovered was limited and "pods that are not recalled are very safe to use", stating *inter alia*:  "[W]e did let our patients know is that this affected only a very small number of pods.  We said 1.5% of pods that were produced in the last year.  ***So this is a very small issue.  It's — people can be assured that the pods that are not recalled are very safe to use***."

51.     On April 29, 2026, Insulet issued a Regulation FD disclosure stating that on April 10, 2026, the Company "updated communications to customers and posted on its website information" regarding the March 2026 MDC, adding "13 expired lots" of Omnipod 5s.

52.     On May 6, 2026, Insulet held a conference call to discuss its financial and operating results for the quarter ended March 31, 2026 (the "Q1 2026 Earnings Call").  During that call, Defendant McEvoy represented that Insulet's Omnipod 5 boasted a "strong clinical efficacy and safety profile", stating *inter alia*:

> Innovation remains the core driver of our growth strategy, beginning with this year's launch of our second-generation algorithm, coupled with our Libre 3 Plus Sensor integration and the broader rollout of Omnipod Discover, our new data insights platform. . . .  [W]e improved the algorithm performance, so it now increases the amount of time users spend in automated mode with fewer interruptions during extended high glucose events. This has been a pain point for prescribers and Podders.  ***We are pairing these two launches with an increased focus on clinical education to ensure prescribers understand the strong clinical efficacy and safety profile of Omnipod 5***.

53.     Later during the Q1 2026 Earnings Call, Defendant McEvoy represented that Defendants "remain focused on quality, reliability, and customer safety", specifically in the context of Defendants' manufacturing operations and the March 2026 MDC, stating *inter alia*:

> [S]caling global manufacturing and operations continues to be a priority.  ***We remain focused on quality, reliability and customer safety***.  Our team rapidly

13

responded to execute the voluntary medical device correction in March and implemented targeted fixes for the applicable manufacturing process. Manufacturing disposable, sophisticated electromechanical devices at consumer scale and medical quality is a complex process.

54.    Also during the Q1 2026 Earnings Call, when asked about "investor consternation around the [March 2026] recall", Defendant McEvoy represented that Defendants were focused on the safety of their products, that "patient safety is always our #1 priority", and that Defendants had taken "targeted corrective actions" to address the manufacturing issues leading to the March 2026 MDC, stating *inter alia*:

> [I]n our industry, field actions are a part of being in a health care industry, but it was an absolute tough moment for us.  And *patient safety is always our #1 priority*. We're monitoring and we're investigating customer complaints routinely.  *I am proud with how our team rapidly responded to the voluntary medical device in March*. . . .  Now last week was another tough week with the [U.S. Food and Drug Administration ("FDA")] updating its communication about our MDC to reflect our April 10 update and misreported NDRs as SAEs.[2]  And listen, I know this created a bunch of confusion, and we're really not happy about that.  What's important to know, though, is no additional adverse events from the MDC have been reported since the April 10 update.[3]  And if anything, taking a step back, I think this really enunciates the high level of complexity of manufacturing sophisticated disposable electromechanical devices at scale.  And in our industry, it's not possible to eliminate all risk, but *what matters most is how issues are identified and addressed.  And in this case, we got after it early.  We've implemented targeted corrective actions*, and we are going to continue to strengthen and invest in our quality systems and operating controls.

55.    The statements referenced in ¶¶ 48–54 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material

---

[2] On April 29, 2026, the U.S. FDA posted on its website an announcement concerning the March 2026 MDC, stating that "As of April 17, Insulet has reported 476 serious injuries and no deaths associated at this time", far more serious injuries than the Company's initial disclosure, which cited 29 "serious adverse events".  The same day, Insulet issued a Regulation FD disclosure announcing "The Company confirmed that the FDA statement is referring to 476 Medical Device Reports potentially related to the [March 2026 MDC] rather than the 29 confirmed Serious Adverse Events."  As of April 30, 2026, the FDA's website no longer referenced the "476 serious injuries" figure.

[3] *See supra* ¶ 51.

14

adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Insulet had deficient manufacturing controls and procedures; (ii) the manufacturing issue that precipitated the March 2026 MDC affected a greater number of Insulet Pod products than Defendants claimed; (iii) the foregoing created a foreseeable heightened risk that one or more Insulet products would be found to be in violation of applicable safety regulations and/or pose a risk of injury; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

### The Truth Continues to Emerge

56.     On May 26, 2026, Insulet disclosed that it had "initiate[d]" another "voluntary Medical Device Correction" (the "May 2026 MDC"), this time "for specific lots of Omnipod® 5, Omnipod Dash®, and Omnipod® Insulin Management System (Omnipod Eros) Pods due to a manufacturing issue, identified through ongoing product monitoring, that could result in insulin under-delivery." Like the MDC that Insulet announced on March 12, 2026, Insulet disclosed that a similar issue precipitated this MDC: "[p]ods from specific lots may have a small tear in the tubing (cannula) just above the skin" and "[i]f this occurs, insulin may leak outside of the Pod instead of being fully delivered into the body as intended, potentially leading to under-delivery of insulin." Unlike the limited scope of the March 12, 2026 MDC, this MDC "includes certain Pod lots distributed in the U.S. and affected international markets."

57.     Insulet further disclosed that a far greater amount of its products, "[a]pproximately 7 million Pods" were affected by this MDC, "represent[ing] approximately 8.5% of 2025 global Omnipod Pod production."

58.     In Insulet's related Regulation FD disclosure, the Company disclosed that the March 2026 and May 2026 MDCs "both . . . were related to cannula tears associated with cannula

handling at the Company's Acton, Massachusetts facility" and claimed that the purportedly "enhanced quality controls implemented in connection with the prior action" addressed the product issue that precipitated the May 2026 MDC, stating *inter alia*: "All product in scope of [the May 2026 MDC] correction was manufactured before the enhanced quality controls implemented in connection with the prior [March 2026 MDC] action were put in place."

59.    On this news, Insulet's stock price fell $7.79 per share, or 5.07%, to close at $146.01 per share on May 27, 2026.

60.    Following Defendants' revelations, analysts lowered their respective price targets for Insulet's stock.  On May 26, 2026, BTIG reduced its price target approximately 9.6%, from $260 to $235, writing "we are trimming our valuation multiple from ~4.5x to ~4x" and "this reduced multiple reflects continued negative investor sentiment and what we perceive to be some risk of reputation damage or increased regulatory scrutiny from this second voluntary [medical device correction ("MDC")]."  Similarly, on May 27, 2026, Goldman Sachs wrote "we are not so sure that referencing back to the March MDC sufficiently captures the magnitude of the quality issues" and "we do not fully subscribe to the reiteration of guidance and have lowered estimates accordingly".

61.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

62.    Defendants had both the motive and opportunity to commit fraud.  ***During the Class Period, the Individual Defendants enriched themselves by selling 21,180 shares of Insulet common stock for over $5.9 million in proceeds***.  Defendant Benjamin sold 12,594 shares of

Insulet common stock, collecting proceeds of approximately $3.7 million, while Defendant Hollingshead sold 6,821 shares of Insulet common stock, collecting proceeds of approximately $1.8 million, and Defendant Chadwick sold 1,765 shares of Insulet common stock, collecting proceeds of approximately $441,691.

63.    Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Defendants repeatedly spoke to the safety of Omnipod products, as alleged *supra* ¶¶ 37–38, 42, 48, 50, 52, their ability to manufacture safe, quality products at scale, as alleged *supra* ¶¶ 29–31, 35, 41, 43, 53–54.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

64.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Insulet securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

65.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Insulet securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

17

thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Insulet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

68.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Insulet;

- whether the Individual Defendants caused Insulet to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Insulet securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

18

69.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

70.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Insulet securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Insulet securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

71.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

72.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

73.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

75.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Insulet securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Insulet securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

76.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Insulet securities.  Such reports, filings, releases and statements were

20

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Insulet's finances and business prospects.

77.    By virtue of their positions at Insulet, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Insulet, the Individual Defendants had knowledge of the details of Insulet's internal affairs.

79.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Insulet.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Insulet's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Insulet securities was artificially inflated throughout the Class Period.  In ignorance of the adverse

21

facts concerning Insulet's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Insulet securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

80.     During the Class Period, Insulet securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Insulet securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Insulet securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Insulet securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

81.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

83.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84.     During the Class Period, the Individual Defendants participated in the operation and management of Insulet, and conducted and participated, directly and indirectly, in the conduct of Insulet's business affairs.  Because of their senior positions, they knew the adverse non-public information about Insulet's misstatement of income and expenses and false financial statements.

85.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Insulet's financial condition and results of operations, and to correct promptly any public statements issued by Insulet which had become materially false or misleading.

86.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Insulet disseminated in the marketplace during the Class Period concerning Insulet's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Insulet to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Insulet within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Insulet securities.

87.     Each of the Individual Defendants, therefore, acted as a controlling person of Insulet.  By reason of their senior management positions and/or being directors of Insulet, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

Insulet to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Insulet and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

88.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Insulet.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  July 2, 2026

Respectfully submitted,

ANDREWS DEVALERIO LLP

*/s/ Daryl Andrews*
Daryl Andrews (BBO #658523)
Glen DeValerio (BBO #122010)
P.O. Box 67101
Chestnut Hill, Massachusetts 02467
Telephone: (617) 999-6473
Telephone: (410) 862-1259

daryl@andrewsdevalerio.com
glen@andrewsdevalerio.com

POMERANTZ LLP
Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

**\****Pro hac vice* applications forthcoming

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, _____Zhenjun Hu_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Insulet Corporation ("Insulet") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Insulet securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Insulet securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Insulet securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** _____4/14/2026_____
                  **(Date)**

Signed by:

_____
                  **(Signature)**

2E493440967E4AF...

ZHENJUN HU

_____
                  **(Type or Print Name)**

**Insulet Corporation (PODD)**                                                    **Zhenjun Hu**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 2/19/2026 | 1 | $257.0000 |
| Purchase/Acquisition | 2/19/2026 | 1 | $246.6000 |
| Purchase/Acquisition | 2/19/2026 | 1 | $244.7000 |
| Purchase/Acquisition | 2/20/2026 | 1 | $239.4650 |
| Purchase/Acquisition | 2/24/2026 | 1 | $242.3000 |
| Purchase/Acquisition | 2/27/2026 | 1 | $246.0000 |
| Purchase/Acquisition | 3/2/2026 | 1 | $242.4200 |
| Purchase/Acquisition | 3/5/2026 | 1 | $239.8000 |
| Purchase/Acquisition | 3/6/2026 | 1 | $236.2500 |
| Purchase/Acquisition | 3/6/2026 | 1 | $234.0000 |
| Purchase/Acquisition | 3/12/2026 | 1 | $221.8000 |
| Purchase/Acquisition | 3/13/2026 | 1 | $218.5000 |
| Purchase/Acquisition | 3/18/2026 | 1 | $230.2800 |
| Purchase/Acquisition | 3/19/2026 | 1 | $227.5000 |
| Purchase/Acquisition | 3/25/2026 | 1 | $219.0000 |
| Purchase/Acquisition | 3/25/2026 | 1 | $214.0500 |
| Purchase/Acquisition | 3/27/2026 | 1 | $214.0000 |
| Purchase/Acquisition | 3/27/2026 | 1 | $210.0000 |
| Purchase/Acquisition | 3/27/2026 | 1 | $208.0000 |
| Purchase/Acquisition | 4/1/2026 | 1 | $205.0000 |
| Purchase/Acquisition | 4/9/2026 | 1 | $200.0000 |
| Purchase/Acquisition | 4/13/2026 | 1 | $195.0300 |
| Sale | 2/23/2026 | (2) | $248.2000 |
| Sale | 2/23/2026 | (1) | $249.5661 |
| Sale | 2/25/2026 | (1) | $248.0000 |
| Sale | 3/11/2026 | (1) | $239.0000 |
| Sale | 3/16/2026 | (2) | $227.5100 |
| Sale | 3/26/2026 | (1) | $220.0000 |
| Sale | 3/26/2026 | (1) | $220.7400 |
| Sale | 3/31/2026 | (2) | $210.2050 |
| Sale | 4/13/2026 | (11) | $195.0000 |